AO 106 (Rev. 04/10) Application for a Search Warrant

HH

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>15525 TR 390, FRAZEYSBURG, OH; WILLIAM ROBERT<br>DUNFEE, DOB XX/XX/1965, SSN XXX-XX-0205 | )<br>)<br>)<br>)<br>) | Case No. 2:22-mj-649 |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, Attachment B, and Attachment C incorporated herein by reference.

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment D, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1752(a)(1), (2) | Restricted Building or Grounds Violations |
| 18 U.S.C. § 1512(c)(2) | Obstruction of an Official Proceeding |
| 18 U.S.C. § 231(a)(3) | Civil Disorder |

The application is based on these facts:

See attached affidavit incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Andrew D. McCabe, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/30/2022

Chelsey M. Vascura
United States Magistrate Judge
*Judge's signature*

City and state: Columbus, Ohio

CHELSEY M. VASCURA, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN THE MATTER OF THE SEARCH OF:
**15525 TOWNSHIP ROAD 390,**
**FRAZEYSBURG, OHIO**

Case No.  2:22-mj-649

**WILLIAM ROBERT DUNFEE,**
**DOB XX/XX/1965, SSN XXX-XX-0205**

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A
### WARRANT TO SEARCH AND SEIZE

I, Andrew McCabe, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search (1) the premises known as 15525 Township Road 390, Frazeysburg, Ohio, hereinafter "PREMISES," further described in Attachment A and (2) William Robert Dunfee, DOB XX/XX/1965, SSN XXX-XX-0205, hereinafter "DUNFEE," and further described in Attachment B, for the items described in Attachment C.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and in my duties as a special agent, I am responsible for investigating violent crime, crimes against children, and domestic terrorism. Currently, I am tasked with investigating criminal activity in and around the Capitol grounds on January 6, 2021. As an FBI Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detection, investigation, or prosecution of a violation of Federal criminal laws.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.     Based on the facts set forth in this affidavit below, there is probable cause to believe that DUNFEE violated 18 U.S.C. § 1752(a)(1), (2) and (4) (Restricted Building or Grounds Violations); 1512(c)(2) (Obstruction of an Official Proceeding); 18 U.S.C. § 231(a)(3) (Civil Disorder) and 40 U.S.C. § 5104(e)(2) (Violent Entry and Disorderly Conduct on Capitol Grounds).

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

5.     U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

6.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate side, and two large

skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

7.     The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

8.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

9.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST). Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

10.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

11. At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

12. At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

13. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence." I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

14. At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

15. Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in

the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this."



16.     Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

17.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol

on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

18. Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

19. At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

20. At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



21.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?" Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.

7



22.     One subject left a note on the podium on the floor of the Senate Chamber. This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



23.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals are expected to be taken into custody.





24.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

25.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

26.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

27.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

28.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left

the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

29.  Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

30.  Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

31.  Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

32.  During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

33.  Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

34.  Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing

property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

35.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



---

[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





[2] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.
[3] https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

13

### *Identification of WILLIAM DUNFEE*

36.     On or about February 3, 2021, a tipster provided a screen capture of comments made on the Facebook group "Here We Go with Jeremy Herrell," which read, "Amen Brother. My local ministry group was there and members of our group 'stormed' the Capital for a redress of our grievances. Leading the way was Pastor Bill. We as Christians have the duty to overthrow evil." Later the same tipster posted, "Just a clarification… Pastor Bill and several others of our group made into the interior doors of the Capital. They pushed back and forth with the police. They talked to the officers and told them why they were there. Not to harm or destroy. They wanted to talk to the Congress. When an officer came back and said that wasn't possible, they tried to force the doors open. They were pepper sprayed and were stopped."  The tipster also identified Bill Dunfee as being the pastor at the New Beginning Ministries Warsaw church.

37.     The FBI subsequently identified WILLIAM DUNFEE as the pastor of New Beginnings Ministries Warsaw, a church located in Warsaw, Ohio.

38.     On or about February 26, 2021, the Cincinnati FBI began an investigation to determine if DUNFEE was the individual referenced in Facebook group post.

39.     On or about March 2, 2021, database checks were completed for DUNFEE and agents identified five possible cellular telephone numbers associated with him, including phone number x0353.  According to records obtained by search warrant from Google, a mobile device associated with phone number x0353 was present at the U.S. Capitol on January 6, 2021.[4]

---

[4] Google estimates device location using sources including GPS data and information about nearby Wi-Fi access points and Bluetooth beacons.  This location data varies in its accuracy, depending on the source(s) of the data.  As a result, Google assigns a "maps display radius" for each location data point.  Thus, where Google estimates that its location data is accurate to within 10 meters, Google assigns a "maps display

40.     According to records obtained by subpoena from TracFone Wireless, phone number x3053 was subscribed in the name of DUNFEE's business partner in Cross Builders, a construction company located in Coshocton, Ohio. A publicly available website for Cross Builders lists DUNFEE and his business partner as the owners of Cross Builders and attributes phone number x0353 to DUNFEE.

41.     Your affiant obtained DUNFEE'S Ohio Driver's License Photo. A review of open-source video footage and closed-circuit video (CCV) footage from the U.S. Capitol building of the events of January 6, 2021, revealed DUNFEE present in various locations in Washington, D.C., and in the restricted area of the U.S. Capitol grounds (see photographs 1 and 2 below). In the photographs, DUNFEE is seen wearing a dark colored jacket, and a dark colored hat with a distinctive oval emblem on the front and gold design on the bill.  Your affiant viewed these pictures and compared them to the Ohio Driver's License photograph of DUNFEE and determined them to be the same person.

Photograph 1          Photograph 2

     

radius" of 10 meters to the location data point.  Finally, Google reports that its "maps display radius" reflects the actual location of the covered device approximately 68% of the time.

15

42.     On March 22, 2021, in response to a message left at the New Beginnings Ministries, DUNFEE contacted the FBI using phone number x0353. During a telephonic interview, DUNFEE stated that he attended the rally in Washington, D.C., on January 6, 2021. DUNFEE claimed that he did not know anyone else who attended the rally except for the people who were in his group, whom he declined to identify. DUNFEE then stated that he had spoken to his attorney and did not wish to answer further questions at that time.

43.     On or about July 3, 2021, the FBI National Threat Operations Center (NTOC) received additional information from a tipster concerning DUNFEE. Specifically, photographs were provided showing DUNFEE inside the restricted areas of the U.S. Capitol grounds (see photograph 3). Your affiant has reviewed this photograph and compared it to the Ohio Driver's License Photograph of DUNFEE and found it to be the same person wearing the same distinctive hat described above.

Photograph 3



44.     On September 1, 2021, another online tip was submitted to the FBI NTOC regarding DUNFEE'S activities at the U.S. Capitol on January 6, 2021. Specifically, three images were provided showing DUNFEE physically resisting U.S. Capitol Police by pushing against a metal barricade and entering the restricted areas of the U.S. Capitol grounds (see photographs 4, 5, and 6

below). Your affiant reviewed these photographs and compared them to the Ohio Driver's License Photograph of DUNFEE and found the person in the pictures to be the same person.

Photograph 4



Photograph 5



17

Photograph 6



45.     On October 8, 2021, your affiant met with a Coshocton County Sheriff's Office Deputy who was familiar with DUNFEE from previous encounters and showed the deputy two photographs (see photographs 7 and photograph 8) obtained by the FBI as part of its investigation. The Deputy identified both images as DUNFEE.

Photograph 7                         Photograph 8

 

46.     During this investigation, your affiant has reviewed multiple open source videos and CCV footage taken before, during, and after the January 6, 2021 riot at the U.S. Capitol. In a number of these videos, DUNFEE can be seen and heard. In these videos, DUNFEE is seen wearing tan boots,

18

blue jeans, a grey, checkered pattern shirt, a black jacket with a white emblem on the left breast with the word "CROSS," and a black baseball hat with a distinctive oval emblem. Based on this review, your affiant has developed an approximate timeline of events in which DUNFEE was involved.

47. On December 27, 2020, in a publicly available video posted on the New Beginnings Ministries Warsaw Facebook page, DUNFEE told his congregation, "The Government, the tyrants, the socialists, the Marxists, the progressives, the RINOs, they fear you. And they should. Our problem is we haven't given them reason to fear us." Later, DUNFEE stated, "As I said earlier in another previous sermon is this, they used to tell us, you know what, you settle your differences at the ballot. How did that work out for us? It's not over. November the 4th through the 6th, we are heading to D.C. Who's going with us? [Unidentified person: January.] January 4th through 6th... Are you ready?"

48. On January 6, 2021, at approximately 9:23 am, DUNFEE is shown in a publicly available video standing in a raised flower bed on the East Plaza of the U.S. Capitol grounds (see photograph 9 below). DUNFEE spoke into a bull horn and told the crowd, "This election has been stolen right out from underneath of our noses and it is time for the American people to rise up. Rise up. Rise up. Today is the day in which it is that these elected officials realize that we are no longer playing games. That we are not sheeple that are just going to be [unintelligible] according to [unintelligible]." Later in the video, DUNFEE stated, "We will stand up for our country. We are standing up for our freedoms. We are standing up for our president. And today is the day these elected officials, these senators and these congressmen, understand that we are not going to allow this to continue any longer." Later in the video, DUNFEE stated, "I am not talking about any of the nonsense of burning buildings and destroying another man's property, but they [elected officials] need to fear us."

19

Photograph 9



49.     At approximately 1:14 pm, DUNFEE is shown standing on a low wall outside the barricades on the East side of the U.S. Capitol grounds speaking into a bull horn (see photograph 10 below). DUNFEE told the crowd, "They just objected to Arizona." Your affiant believes DUNFEE referenced the certification proceedings underway inside the U.S. Capitol at that time.

Photograph 10



20

50.    At approximately 1:21 pm, DUNFEE said, "Remember this. If they let us down we are going to our house, [unintelligible] protect the Constitution [unintelligible], people in the house. We are going to our house." Your affiant compared the voice making the aforementioned statements to that of DUNFEE and determined the voices to be the same.

51.    At approximately 1:26 pm, DUNFEE said, "Reinforcements around back. If you are able to move around back, they need some support around back." Your affiant compared the voice making the aforementioned statements to that of DUNFEE in publicly available video posted on the New Beginnings Ministries Warsaw Facebook page and determined the voices to be the same.

52.    At approximately 1:28 pm, DUNFEE is seen speaking to the crowd on a bullhorn (see photograph 11 below). DUNFEE told the crowd, "Donald Trump is leading. President Trump is leading the crowd, [unintelligible] alright, [unintelligible], fight for Trump. Hold the line." The crowd then began to chant, "Fight for Trump."

Photograph 11



53.     At approximately 1:35 pm, DUNFEE is seen holding a bullhorn (see photograph 12 below).  DUNFEE stated, "Mister police officers, we want you to understand something. We want you to understand something. We want Donald Trump and if Donald Trump is not coming, we are taking our house. We are taking our house." Your affiant believes DUNFEE informed U.S. Capitol Police that the crowd of rioters would breach the U.S. Capitol by force if necessary.

Photograph 12



54. At approximately 1:44 pm, DUNFEE is observed pushing a metal barricade against U.S. Capitol Police, who are attempting to hold the line. When the barricade is breached, DUNFEE is seen advancing toward the U.S. Capitol Building before turning around and returning behind the barricade (see photographs 13 and 14 below).

23

Photograph 13            Photograph 14

 

55.　　Based on your affiants review of multiple videos taken from different angles, this video corresponds to events captured by photographs 4, 5, and 6, previously listed above.

56.　　At approximately 1:52 pm, DUNFEE is seen standing in front of the barricades on the East Front of the U.S. Capitol grounds speaking to the crowd on a bull horn (see photograph 15 below). DUNFEE claimed that he spoke to a U.S. Capitol Police officer and requested permission for the crowd to go to the base of steps of the U.S. Capitol. DUNFEE stated, "We don't want violence… We don't want destruction and we don't want you going to jail if you don't have to."

Photograph 15



57.     At approximately 1:58 pm, DUNFEE is depicted in multiple videos pushing against a metal barricade against U.S. Capitol Police on a second occasion. This time, DUNFEE used his back to push against the barricade (see photographs 16 and 17 below).

Photograph 16                          Photograph 17

    

58.     At approximately 1:20 pm, after the metal barricade was breached by rioters, DUNFEE is depicted in multiple videos walking across the area on the East Front beyond the barricades and advancing towards the U.S. Capitol Building with his hands raised (see photographs 18 and 19 below).

Photograph 18                          Photograph 19

    

59.     At approximate 2:07 pm, DUNFEE is depicted in multiple videos at the front of the crowd of rioters at the East Front entrance to the U.S. Capitol Building, also referred to as the Columbus Doors (see photographs 20 and 21 below). DUNFEE can be heard telling rioters to raise their arms as he walks toward a group of U.S. Capitol Police maintaining the line at the East Front doors.

Photograph 20                          Photograph 21




60.     At approximately 2:18 pm, DUNFEE is depicted in a video outside the East Front doors holding a bullhorn. DUNFEE tells the individual filming that he had just been pepper sprayed.

61.     At approximately 2:20 pm, DUNFEE is depicted in a video pushing his way through the rioters and approaching the East Front doors again.

62.     At approximately 2:23 pm, DUNFEE is depicted in a video standing against the East Front doors in front of a large crowd of rioters after U.S. Capitol Police deployed chemical agents (see photograph 22 below). DUNFEE then walks away from the East Front doors, as other rioters attempt to breach the U.S. Capitol Building.

Photograph 22



63.     At approximately 2:47 pm, DUNFEE is depicted in a video outside the East Front doors after that entrance to the U.S. Capitol had been breached. Other rioters can be seen exiting the U.S. Capitol building. An unidentified male with a wearing a red hat with a blue neck gator and a black jacket exits the building and stated, "We did it. We got our job done." DUNFEE made an unintelligible reply. The unidentified male responded, "We did it, we shut 'em all down. We did our job." DUNFEE responded, "Hallelujah." A short time later, DUNFEE told the crowd of rioters, "Mission accomplished." Your affiant believes DUNFEE advised the crowd that the riot had been successful in disrupting and delaying the certification proceeding, which had been ongoing inside the U.S. Capitol.

64.     In a publicly available video posted on May 30, 2021, to the New Beginnings Ministries Warsaw Facebook page (see photograph 23 below), DUNFEE told his congregation, "We show up January 6th at the Capitol Building right? To let it be known that we are not going to stand back and let an election be stolen. That we are going to hold our legislators accountable, and so on and so forth? And what did that get us? Huh? We are all deemed what? Huh? Bunch of terrorists,

right?" Later DUNFEE stated, "I can tell you, having been there [at the U.S. Capitol], that um, we were surrounded by patriots. Many, many, many, many patriots. And I thank god they showed up to um, just to let it be known, that you know, what the bottom line is this, that um, you are not stealing this election. You're not going to rob us, deprive us of a democracy, of a republic, without us being heard."

Photograph 23



65.     Based on the foregoing, your affiant submits that there is probable cause to believe that WILLIAM DUNFEE violated 18 U.S.C. § 1752(a)(1), (2), and (4), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; (4) knowingly engages in any act of physical violence against any person or property in any restricted building or grounds; or

29

attempts or conspires to do so. For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

66. Your affiant submits there is also probable cause to believe that WILLIAM DUNFEE violated 40 U.S.C. § 5104(e)(2)(D), which makes it a crime to willfully and knowingly utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and 40 U.S.C. § 5104(e)(2) (F) which makes it a crime to engage in an act of physical violence in the Grounds or any of the Capitol Buildings.

67. Your affiant submits there is probable cause to believe that WILLIAM DUNFEE violated 18 U.S.C. § 231(a)(3), which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. For purposes of Section 231 of Title 18, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes

the Joint Session of Congress where the Senate and House count Electoral College votes.

68.     Finally, your affiant submits there is probable cause to believe that WILLIAM DUNFEE violated 18 U.S.C. § 1512(c)(2), which makes it a crime to obstruct, influence, or impede any official proceeding, or attempt to do so. Under 18 U.S.C. § 1515, congressional proceedings are official proceedings.

## PLACES TO BE SEARCHED

69.     Based on my experience and knowledge, your Affiant knows that people commonly store clothing, personal papers and documents, travel records, videos, photos, electronic devices, including cellular telephones, in places such as their residence, vehicle and phone or on their person – for safe-keeping, work-related purposes and easy access.  This is to include papers, documents, records and photos, which are commonly stored both physically and digitally. This is to include, cellular telephones, such as smart phones, which are commonly used to take and store photographs and videos, send and receive e-mails and texts messages, and to access social media platforms.  As such, this warrant seeks to search the following places, which are described more fully below and in Attachments A and B.

70.     The FBI has conducted the following investigation associating the PREMISES to DUNFEE:

> a.   On June 25, 2022, a check of the Ohio Bureau of Motor Vehicles for WILLIAM DUNFEE showed him as the registered owner of a 2017 GMC Yukon bearing Ohio License Plate JFQ3134, with a registration address of 15525 Township Road 390, Frazeysburg, Ohio.

31

b. On July 21, 2022, the FBI conducted a surveillance of DUNFEE. During the surveillance, a grey GMC Yukon was observed at the River View Community Park during a New Beginnings Ministries Church event. Later during the surveillance, the GMC Yukon was observed parked outside the New Beginnings Ministries Church in Warsaw, OH. Later the GMC Yukon was observed parked on the side of Township Road 390 approximately one quarter mile form 15525 Township Road 390.

c. On August 23, 2022, employees at the Frazeysburg Post Office identified the "BILL DUNFEE" as a resident at 15525 Township Road 390, Frazeysburg, OH. The employees knew DUNFEE to be a pastor and work in the construction trade.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

71.     As described above and in Attachment C, this application seeks permission to search for records that might be found on the PREMISES or on the PERSON in whatever form they are found. One form in which the records might be found is data stored on a cellular telephone. Thus, the warrant applied for would authorize the seizure of cellular telephones or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

72.     *Probable cause.* Your Affiant submits that if a wireless or cellular telephone is found on the PREMISES or PERSON there is probable cause to believe those records will be stored on that wireless or cellular telephone for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that files or remnants of such files can be recovered months or even years after they have been downloaded

32

onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

73.     *Forensic evidence.*  As further described in Attachment C, this application seeks permission to locate not only files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how cellular telephones were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES or on the PERSON because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the

United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both

35

show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.

36

Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

74. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who

has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES or on the PERSON. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

75. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

38

storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

76.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and the PERSON described in Attachment B, as well as seize the items described in Attachment C, which contain fruits and instrumentalities of the crimes set forth herein.

Respectfully submitted,

Andrew D. McCabe
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on:     September 30, 2022

Honorable Chelsey M. Vascura
U.S. Magistrate Judge
Southern District of Ohio

39

**ATTACHMENT A**

*DESCRIPTION OF PREMISES TO BE SEARCHED*

The premises to be searched is 15525 TOWNSHIP ROAD 390, FRAZEYSBURG,

OHIO, further described as a single-family residence. The number "15525" is affixed to the right

mailbox.  The search will also include a detached garage, and any other structures, sheds,

outbuildings, or makeshift structures located on the lot associated with the above listed address.

Photograph 24



Photograph 25



Photograph 26



**ATTACHMENT B**

*DESCRIPTION OF PERSON TO BE SEARCHED*

The person to be searched is WILLIAM ROBERT DUNFEE, XX/XX/1965, SSN XXX-XX-0205, Ohio Driver License RQ421179.

DUNFEE's Ohio Driver License photo is copied below.



4

## ATTACHMENT C

### *Property to be seized from Premises and Person*

1.      All records, evidence, contraband, fruits, or instrumentalities relating to violations of 18 U.S.C. § 231(a)(3) (Civil Disorder); 18 U.S.C. § 1521(c)(2) (Obstruction of an Official Proceeding); 18 U.S.C. § 1752(a)(1), (2) and (4) (Restricted Building or Grounds Violations); and 40 U.S.C. § 5104(e)(2) (Violent Entry and Disorderly Conduct on Capitol Grounds), involving WILLIAM ROBERT DUNFEE, including, but not limited to:

   a.   Cellular phone utilizing cellular telephone number XXX-XXX-0353;

   b.   Black jacket with a white emblem on the left breast with the word "CROSS," a black baseball hat with a distinctive oval emblem, and any other clothing matching those seen in the still photos and video relating to the above-listed violations;

   c.   Blue bullhorn and red bullhorn seen in still photos and video related to the above-listed violations;

   d.   Records, documents or information of travel, attendance, participation, or commission related to the above-listed violations;

5

    e.   Wireless or cellular telephones used as a means to commit the violations described above, including an electronic device that may have been used to communicate with and/or record others in committing or attempting to commit the above-listed violations.

2.    For any wireless or cellular telephone whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "Device"):

    a.   evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.   evidence of the lack of such malicious software;

    c.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the deviceuser;

    d.   evidence of the attachment of the Device of other storage devices or similar containers for electronic evidence;

    e.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device;

    f.   passwords, encryption keys, and other access devices that may be necessary to access the Device;

    g.   documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device;

6

h.  records of or information about Internet Protocol addresses used by the Device;

i.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7